**UNITED STATES of America, Appellee,**

v.

**Brian STUDLEY, Defendant–Appellant.**

**No. 532, Docket 94–1228.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 22, 1994.

Decided Feb. 13, 1995.

Norman Trabulus, Mineola, NY, for defendant-appellant.

Douglas T. Burns, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Emily Berger, Asst. U.S. Atty., of counsel), for appellee.

Before: OAKES, JACOBS and CALABRESI, Circuit Judges.

OAKES, Senior Circuit Judge:

Brian Studley appeals from an April 28, 1994, judgment of conviction, after a guilty plea, of one count of mail fraud in violation of 18 U.S.C. § 1341, entered in the United States District Court for the Eastern District of New York, Arthur D. Spatt, J. Studley was sentenced to ten months of incarceration, followed by two years of supervised release, and was required to pay a special assessment of $50.

The sentence was based on the district court's determination that activities of other offenders were "jointly undertaken" with Studley within the meaning of U.S.S.G. § 1B1.3(a)(2) and thus were attributable to Studley for sentencing purposes as relevant conduct. The issue on appeal is whether the district court used the proper legal standard in making this determination. As set forth below, we hold that the district court did not apply the correct legal standard and thus did not make the findings of fact necessary to determine whether the defendant participated in jointly undertaken criminal activity. We vacate the sentence and remand for further fact-finding and for resentencing in accordance with this opinion.

## I. Background

On July 29, 1993, Brian Studley pled guilty to fraudulently inducing a customer to pay a $249 application fee for a loan the customer would never actually receive, thereby committing one count of mail fraud. The fraud took place while Studley worked as a salesperson in a telemarketing operation which employed between ten and twenty sales representatives, all of whom were making similar false representations to customers. In Studley's Presentence Report, the Probation Department recommended to the court that Studley be held accountable for the entire loss caused by the telemarketing operation during the term of his employment, just under $120,000, as it was relevant conduct pursuant to U.S.S.G. § 1B1.3(a)(2).

Studley objected to this recommendation in a letter dated January 17, 1994. He argued that the actions of the other employees of the telemarketing operation were not "jointly undertaken criminal activity" within the meaning of section 1B1.3(a)(2), and therefore should not be attributed to Studley. Studley argued that he should be liable only for the estimated $5,000—$10,000 loss he caused himself.

The district court held a sentencing hearing on March 11, April 8 and April 15, 1994, in order to determine the scope of Studley's relevant conduct. The first day of the hearing was dedicated to the issue addressed in this appeal: whether Studley should be held accountable for the loss caused by the operation as a whole, or only for the loss caused directly by Studley. At the outset of the hearing the judge read from the relevant sections of the Presentence Report and the defendant's letter to the court requesting the hearing, but the court did not set out the legal standard by which its decision would be made.

## A. The Events

The facts proffered by the government at the sentencing hearing and set forth in Studley's Presentence Report prepared by the Probation Department are not disputed by Studley in this appeal:

Pacific Consulting, Inc. ("Pacific") was a telemarketing company established by a man named Howard Adler[1] for the sole purpose of carrying out a fraudulent loan scheme. Adler leased office space in a commercial building and furnished a reception area, offices and several rooms of telephone banks. Pacific, under the guidance of Adler, placed advertisements in newspapers throughout the United States offering individual loans in exchange for advance fees. The advertisement included a telephone number that potential borrowers could call to apply for a loan. Adler hired employees to answer the telephone calls from applicants, and instructed his employees to require applicants to submit an application fee in order to be considered for a loan. Although there is some evidence that Adler initially had a relationship with a lending company, only six of the approximately 1,100 applicants actually received loans during the twelve weeks Adler was in business. During that time, Pacific took in an estimated $273,153 in application fees. According to the Postal Inspectors who investigated the case, Adler was in total control of the proceeds of the operation and was in control of the criminal activity.

Adler hired between ten and twenty sales representatives, including Studley, to process the telephone calls from would-be borrowers. Rolf Ihlenfeldt, a former sales representative of Pacific, was the government's sole witness at the sentencing hearing on the issue of whether Studley participated in jointly undertaken criminal activity. He testified that he applied for a telemarketing position at Pacific by answering an advertisement in New York Newsday, a paper of general circulation in the New York–Long Island area, for a position as a telemarketing representative.

Ihlenfeldt testified that Studley started working about one week after he did and quit five or six weeks later. Ihlenfeldt testified that Adler led the sales representatives to believe that the customers were actually receiving loans, telling them that the customers' loan applications were being processed in Cincinnati, Ohio. Ihlenfeldt learned otherwise when he and the other sales representatives began receiving telephone calls from angry customers. He testified that he learned the customers were not receiving loans after he had worked at Pacific for four or five weeks, but he later testified that he was aware before that time that the customers were not receiving loans.

Ihlenfeldt testified that when he was hired, Adler gave him a script to use when speaking to potential borrowers, which involved taking certain financial information and asking them how much they would like to borrow. The sales representative would then tell the customer that the representative would "go upstairs" and speak with the manager to see if the customer could be preapproved for a loan. If the customer met certain financial requirements, the sales representative, never having actually consulted with a manager, would call the customer back and inform the customer that he or she had been preapproved. The representative would then tell the customer that he or she should send $249

---

1. Adler waived indictment and pleaded guilty to an information charging him with mail fraud. He cooperated with the government, and, accordingly, the government filed a motion with the sentencing court for a downward departure pursuant to U.S.S.G. § 5K1.1. Adler was sentenced to twelve months imprisonment.

by overnight mail to Pacific to cover the cost of processing the loan.

The sales representatives worked together in two rooms which contained banquet tables and telephones. The phones worked on a "hunt" or roll-over system in which the call would ring on phone number one if that phone were free; if phone number one was busy, the call would bounce to phone number two and so on—a modern-day version of a "bucket-shop" operation.

The sales representatives were assigned to telephones based upon their sales performance, with the most productive sales representative on phone number one. Ihlenfeldt was the leading "salesman," and Studley, as the second most productive, was assigned to phone number two. While some sales representatives were paid a weekly base salary of $100, Studley was paid on a pure commission basis—$40 for each $249 application fee brought in. The sales representatives were instructed to use aliases, or "phone names" (Ihlenfeldt knew Studley by the name "Bobby Bates"), which, they were told, were used supposedly because they were more conducive to telephone sales.

Studley was employed at Pacific from July 17, 1991 to August 27, 1991, approximately five and one-half weeks. During this time, Studley collected between $5,000 and $10,000 in fees. It is not clear at what point during his employment Studley realized Pacific was not a legitimate operation, or when he knew he was participating in a scam. Ihlenfeldt testified that he and Studley did discuss the fact that customers were not receiving loans. Ihlenfeldt estimated that at the time of their conversation, two out of three of the calls received by the sales representatives were complaints from customers who had not received loans.

Ihlenfeldt and Studley agreed that Adler's operation was going to be short-lived because there were so many angry customers. Ihlenfeldt and Studley even talked about opening their own loan business, with a customer service department which would refund a customer's money if the customer did not receive a loan.

Ihlenfeldt also testified that Studley joked about the section of the script in which they pretended to "go upstairs" and talk to the manager to get preapproval for the loans. Studley went beyond the scope of the script, Ihlenfeldt testified, in order to induce customers to send the application fee—promising that the loan was guaranteed or stating that he was holding the loan check in his hand or that the customer would receive the loan within twenty-four hours.

Additionally, Ihlenfeldt testified that toward the end of Studley's employment, Studley defrauded Adler by asking customers to send the $249 application fee by Western Union, which Studley would keep in its entirety instead of passing it on to Pacific.

The district court found that Studley should have realized the operation was fraudulent from the outset because the script required him to tell customers he was consulting with a manager to get preapproval for the loans when in fact he was not. Studley does not contest this finding.

No evidence was presented, however, that Studley's involvement in Adler's operation extended in any way beyond his own sales efforts. No evidence suggested that he assisted other sales representatives with their sales, shared in the profits, or participated in any way in the management of the operation.

## B. The District Court Ruling

At the close of the sentencing hearing the district court set out the standard for its decision. It stated that a defendant is accountable for the acts and omissions of others that are both "in furtherance of a jointly undertaken criminal activity" and "reasonably foreseeable in connection with that criminal activity." Transcript of Hearing of March 11, 1994, at 78. The court did not, however, set out the legal standard for determining whether the criminal activity was jointly undertaken. The court concluded:

> To me the government has proved a jointly undertaken criminal activity. The salespeople were all together in one plan or scheme, and it doesn't have to be charged as a conspiracy. And that plan was to act together to call people to send in money for loans ... that were not going

to be consummated. Everybody knew the loans were not going to be consummated, it was a short duration type of scheme. They were in it for the quick kill and then went out again.

The evidence is clear that it is a jointly undertaken criminal activity.

*Id.* at 78–79. The court went on to find that the activity of the other participants was reasonably foreseeable to Studley. The court stated:

As far as the second element, reasonably foreseeable in connection with that criminal activity, what could be more reasonably foreseeable ... than sitting in a room with other salespeople ...? They were practically sitting on each other. They knew what the other people were doing. They heard what the other people were doing.... What could be more reasonably foreseeable than [that] the joint activity would incur all this money sent in [sic]?

As a result of these findings, the district court concluded that Studley should be held responsible for the entire loss caused by the telemarketing operation during the time of his involvement in the scheme, not merely for the loss which he caused directly. Consequently, the court added six points to Studley's Guideline calculation pursuant to U.S.S.G. § 2F1.1(b)(1)(G).

## II. *Discussion*

■ Studley argues that the district court misapplied Guideline section 1B1.3 in that it failed to use the correct legal standard to determine whether Studley participated in jointly undertaken criminal activity. We review the district court's interpretation and application of the Sentencing Guidelines *de novo. United States v. Mucciante,* 21 F.3d 1228, 1237 (2d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 361, 130 L.Ed.2d 315 (1994); *United States v. Stanley,* 12 F.3d 17, 20 (2d Cir.1993).

### A. *The Sentencing Guidelines*

Under Guideline section 2F1.1(b), the base offense level for a crime of fraud is calculated based on the dollar amount of the loss caused by the fraud. U.S.S.G. § 2F1.1(b) (1993).

In addition, Guideline section 1B1.3(a)(1)(B) provides that a base offense level shall be determined on the basis of the following:

in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the *jointly undertaken criminal activity,* that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense....

*Id.* § 1B1.3(a)(1)(B) (emphasis added).

■ Pursuant to this section, if a defendant participates in "jointly undertaken criminal activity," he or she may be sentenced based on criminal acts committed by other participants if the acts were committed in furtherance of the jointly undertaken activity and could reasonably have been foreseen by the defendant. *See, e.g., United States v. Tapia–Ortiz,* 23 F.3d 738, 742–43 (2d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 206, 130 L.Ed.2d 136 *and cert. denied,* — U.S. ——, 115 S.Ct. 286, 130 L.Ed.2d 201 (1994). Therefore, the first question for a court applying this section is whether the defendant participated in jointly undertaken criminal activity.

Our opinions on this portion of section 1B1.3 have primarily focused on the issue of whether conduct was foreseeable to the defendant, and have not directly addressed whether conduct was "jointly undertaken." *See, e.g., Tapia–Ortiz,* 23 F.3d at 743 (defendant cannot be sentenced on the basis of a heroin deal without a showing that it was in furtherance of the conspiracy and that it was reasonably foreseeable to the defendant); *United States v. Lanni,* 970 F.2d 1092, 1093 (2d Cir.1992) ("[i]t is essential that a sentencing judge ... make findings of fact regarding the amount of narcotics reasonably foreseeable by each defendant."); *United States v. Soto,* 959 F.2d 1181, 1186 (2d Cir.1992) (a firearm enhancement may be applied to a defendant's sentence based on a codefendant's possession of a weapon so long as the

possession was reasonably foreseeable to the defendant); *United States v. Perrone,* 936 F.2d 1403, 1417, *clarified,* 949 F.2d 36 (2d Cir.1991) (government presented no evidence showing defendant could have reasonably foreseen that the object of the conspiracy was to manufacture over 5 kilograms of cocaine).

■ Application Note Two of section 1B1.3 provides guidance on how a court should determine whether activity is "jointly undertaken." While the policy statements accompanying the Guidelines should not be treated as substitutes for the Guidelines themselves, and do not "render the statutory standard superfluous," they may be used as "interpretive guides" to assist a court in construing a particular Guideline section. *United States v. Johnson,* 964 F.2d 124, 127–28 (2d Cir. 1992); *see also Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (Guideline commentary is akin to an agency's interpretation of its own regulations).

■ Note Two sets out a two-pronged test: a defendant "is accountable for the conduct ... of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3 Applic. Note 2 (1993). The Note explains that "the scope of the criminal activity jointly undertaken by the defendant (the 'jointly undertaken criminal activity') is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." *Id.* The Note further states that:

> In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e. the scope of the specific conduct and objectives embraced by the defendant's agreement* ).

*Id.* (emphasis added). This determination, as it goes to prong one of the test, must be made before the issue of foreseeability, prong two, is reached. *See United States v. Bush,* 28 F.3d 1084, 1087 (11th Cir.1994).

The November 1, 1993, version of section 1B1.3, in effect at the time of Studley's sentencing, is a product of an amendment made effective November 1, 1992. Earlier versions of this section held the defendant responsible for "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable." U.S.S.G. § 1B1.3 (1989, 1990, 1991). Application Note One accompanying the earlier section defined conduct for which the defendant would be "otherwise accountable" as including "conduct of others in furtherance of the execution of the *jointly-undertaken criminal activity* that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, Applic. Note 1 (1989, 1990, 1991) (emphasis added). The commentary further stated:

> Where it is established that the conduct was *neither* within the scope of the defendant's agreement, *nor* was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

*Id.* (emphasis added).

This earlier version of the commentary required that conduct be both *outside* the scope of the defendant's agreement and *not foreseeable* to the defendant in order for it to be *excluded* from relevant conduct. The 1992 amendment clarified this requirement. It is now plain from the commentary that in order to hold a defendant accountable for the acts of others, a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant.

■ We have previously held that in order for a district court to sentence a defendant on the basis of criminal activity conducted by a coconspirator, a district court must make a particularized finding as to whether the activity was foreseeable to the defendant. *See, e.g., Perrone,* 936 F.2d at 1417. We now find that the Guidelines also require the district court to make a particularized finding of the scope of the criminal activity agreed upon by the defendant. This holding is consistent

with the decisions of other circuits that have considered the issue. *See United States v. Anderson,* 39 F.3d 331, 351–52 (D.C.Cir. 1994); *United States v. Bush,* 28 F.3d at 1087; *United States v. Evbuomwan,* 992 F.2d 70, 72–74 (5th Cir.1993).

We turn next to the issue of how a district court is to determine the scope of the defendant's agreement. Application Note Two states generally that "[i]n determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (*i.e.* the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3 Applic. Note 2 (1993). Several illustrations appended to section 1B1.3 provide guidance.

 One illustration is as follows:

Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.

*Id.* Illus. (c)(6). This illustration demonstrates, first, that a defendant's knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those acts. It also demonstrates that a relevant factor in determining whether activity is jointly undertaken is whether the partici-

pants pool their profits and resources, or whether they work independently. P's success was not dependant upon the other dealers in the area, whereas Q's success was directly tied to the activities of the other dealers.

Another example, Illustration (c)(2), involves an operation similar to the one before us:

Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud. Defendants F and G each are accountable for the amount he personally obtained under subsection (a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable in connection with that criminal activity.

*Id.* Illus. (c)(2). This example demonstrates that another relevant factor in determining whether activity is jointly undertaken is whether the defendant assisted in designing *and* executing the illegal scheme.

A third example, Illustration (c)(7), is also useful:

Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R.

*Id.* Illus. (c)(7). This example shows that the fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation. The relevant inquiry is what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct.

### B. *Application of Guidelines to the Facts of This Case*

In the case at hand, the district court found that Studley participated in jointly undertaken criminal activity based on its findings that "[t]he salespeople were all together in one plan or scheme" and "that plan was to act together to call people to send in money for loans." Transcript of Hearing of March 11, 1994, at 78–79. The court did not make a particularized finding as to the scope of Studley's agreement to participate in the telemarketing scheme, nor did the court consider whether the actions of the other sales representatives were within the scope of that agreement.

The government argues that the court's determination that Studley participated in a plan "to act together to call people to send in money for loans" should be considered a finding that Studley's agreement to work for Adler encompassed all of the illegal activity undertaken by all the sales representatives during his employment. Even if the court's finding could be construed in that way, which we hold it cannot, such a finding would not be supported by the facts set forth in the Presentence Report and proffered by the government at the sentencing hearing.

The evidence put forth to date shows that Studley was hired as an employee by Adler, that he was given instructions by Adler on how to defraud potential borrowers, and that he followed those instructions with some variation. In contrast to defendants F and G in Illustration (c)(2), he did not design or develop the telemarketing scam. In addition, there is no evidence that he worked in any way to further the scheme outside of his sales efforts. While the government's witness at the sentencing hearing testified that Studley defrauded Adler by having customers send application fees by Western Union, which Studley would keep in full instead of passing on to Adler, this activity thwarted rather than furthered the objectives of the operation as a whole. Studley was paid on a pure commission basis, and he received none of the profits of the overall operation. There is no evidence that he assisted other representatives with their sales, and the evidence, in fact, shows that he was competing *against* the other sales representatives for commissions.

There is no dispute that Studley was a successful "salesman", and that, at least toward the end of his employment, he was fully aware that he was defrauding customers. This proves his culpability for the fraud he perpetrated. There is also ample evidence in the record that Studley was aware that the other sales representatives were defrauding customers. But that alone is not enough to hold him accountable for the other employees' fraudulent acts.

The government argues that Studley participated in a jointly undertaken criminal activity because he and the other sales representatives used the same phone bank and office space. It argues that they were pooling resources like defendant Q and his fellow street-level drug dealers in Illustration (c)(6). This argument is not persuasive because neither Studley nor the other sales representatives contributed resources to the telemarketing scheme. The office space and equipment was provided by Adler. Though the sales representatives worked out of the same office, they in no way "pooled" resources.

The evidence proffered to date supports the conclusion that Studley's agreement to participate in the fraudulent scheme was limited to his own fraudulent activity and did not encompass the fraudulent activity of the other representatives. His objective was to make as much money in commissions as he could. He had no interest in the success of the operation as a whole, and took no steps to further the operation beyond executing his sales. The government, however, may not have been on notice that it needed to show the scope of Studley's agreement to participate in criminal activity. On remand, it will have the opportunity to present any evidence to the contrary.

### Conclusion

We remand to the district court for a particularized finding of the scope of Studley's agreement to participate in the fraudulent scheme and for resentencing in accor-

dance with this opinion. Sentence vacated and case remanded for resentencing.