**UNITED STATES of America**

v.

**Andrew ZENESKI, Jr., Defendant.**

**No. 95 CR 0097 (ADS).**

United States District Court,
E.D. New York.

Jan. 13, 1996.

Zachary W. Carter, United States Attorney, Brooklyn, New York by Peter Tomao, Assistant United States Attorney, for Plaintiff.

Norman Trabulus, Mineola, New York, for Defendant.

**MEMORANDUM OF DECISION
AND ORDER**

SPATT, District Judge:

The issue before the Court in the sentencing of the defendant, Andrew Zeneski, Jr. ("Zeneski" or the "defendant") is the amount of the loss to be attributed to this defendant. On March 17, 1995, Zeneski pled guilty to a one count indictment charging him, along with Paul Marino, Ted–John Wilson, Jason Cantor, Anthony Galletta and John Tseng, with conspiracy to commit credit card fraud, a class D felony. According to the indictment, the defendant used a computer to obtain credit card numbers from the computer systems of several hotels located in Raleigh, North Carolina. Zeneski's role in the conspiracy was to procure the credit card numbers and transfer them to Marino, who would use them to purchase computer equipment, which would later be resold to various merchants. Although Zeneski raised multiple issues with regard to his sentencing, only one remains, namely, to what extent he should be held accountable for the acts of his coconspirators.

I. *Background*

The investigation of this credit card fraud scheme commenced on December 19, 1994 after the Director of Security of American Express contacted the United States Secret Service regarding seven unauthorized charges totaling $22,067 in computer equipment purchases made between October and December 1994. The equipment was purchased from COMP USA outlets located in Texas, New Jersey and Connecticut.

In response to this alert, Government agents, with the assistance of Airborne Express, a private carrier, arranged a controlled delivery of computer equipment on December 21, 1994 which led to the arrest of Jason Cantor. The following day, December 22, 1994, an Airborne Express investigator informed the agents that a second man contacted their office inquiring about the controlled delivery packages. On December 23, 1994, the Government arrested Ted–John Wilson after he appeared to pick up the computer equipment. At this time, Wilson informed the agents that he was instructed to pick up the computer supplies by Paul Marino. After the Government arrested Marino, he explained that in April 1994 he attended a meeting of the New York Hack Exchange, a group of computer hackers that meets monthly for the purpose of exchanging information regarding the illegal accessing of computer systems throughout the United States. As a result of the April 1994 meeting, Marino was introduced to Andrew Zeneski, who resided in Raleigh, North Carolina. Zeneski explained to Marino that he was able to access the computer systems of two Raleigh hotels and download credit card information.

Zeneski then agreed to provide Marino with credit card numbers in exchange for computer equipment that Marino would order using the numbers. The numbers were delivered via fax. After Marino obtained the credit card numbers from Zeneski, he used them to purchase computer equipment and then sell the equipment to two fences, John Tseng and Anthony Galletta in Brooklyn, New York.

Incident to Marino's arrest, agents found 186 illegally obtained credit card numbers stolen from the Mariott Residence Inn and the Ramada Inn located in Raleigh, North Carolina. As the result of Marino's cooperation, agents were able to monitor telephone calls between Marino and Zeneski on December 29, 1994 and January 21, 1995. During this period, Zeneski informed Marino that he had obtained additional credit numbers. On January 19, 1995, the defendant advised Marino that he had a list of 100 credit card numbers to deliver, but he would not do so until he received the modem he had previously ordered from Marino.

On January 20, 1995, with Marino's assurances that the modem would be forthcoming, Zeneski agreed to send the list of new numbers. However, because the defendant was afraid that sending them by fax again would be too risky, he sent them in an encrypted form via E-mail. Zeneski then sent Marino a decoding program to retrieve the numbers.

On January 25, 1995, agents executed a search warrant at Zeneski's residence in Raleigh, North Carolina. During the search, the agents found a variety of computer equipment and discovered three credit card lists containing 64 American Express credit card numbers distinct from those that the defendant had previously supplied. On January 26, 1995, Zeneski was arrested after surrendering voluntarily.

According to the August 10, 1995 Pre–Sentence Report, the total losses resulting from this conspiracy amounted to $198,714. The organizer of the conspiracy was Paul Marino. Zeneski served as the source of the credit card numbers which he acquired by accessing hotel computer files. In exchange for supplying the credit card numbers, Zeneski received computer equipment valued at approximately $3,500.

## II. *Discussion*

The parties do not dispute the facts. Rather, they contest how the United States Sentencing Guidelines should be applied. Both parties agree that the Base Offense Level for this conspiracy to commit credit card fraud is 6. *See* U.S.S.G. § 2F1.1(a). However, the parties disagree over the enhancement that should be made as a result of the amount of money lost. The Government and the U.S. Department of Probation and Parole ("Probation Department") contend that Zeneski should be given a 7 level upward adjustment under U.S.S.G. § 2F1.1(b)(1)(I) because he should be held responsible for the entire amount of the loss, namely the sum of $198,714. The Government reasons that under U.S.S.G. § 1B1.3 governing "jointly undertaken activity," Zeneski agreed to supply the credit card numbers for the purpose of making fraudulent purchases, and that the success of the

entire conspiracy was dependent on Zeneski's ability to obtain the credit card numbers. Accordingly, he should be held accountable for the entire loss.

In addition, the Court has already determined that the defendant should receive a 2 level enhancement for playing more than a minimal role in a scheme to defraud more than one person, and a two level downward adjustment for acceptance of responsibility. These calculations result in an offense level of 13, which translates into a sentence of 12 to 18 months.

Zeneski contests the propriety of the 7 level enhancement, arguing that he should not be held liable for the entire 198,714 loss. Rather, he asserts that he should be held responsible only for $3,500 in losses because that is the value of the computer equipment he received for participating in the conspiracy, and that sum represents the extent of his agreement to participate in the criminal conspiracy. According to Zeneski, if the Court attributes the balance of the money stolen would be tantamount to imposing responsibility for activity he did not jointly agree to undertake in violation of U.S.S.G. § 1B1.3, as recently interpreted in the Second Circuit's decision *United States v. Studley*, 47 F.3d 569 (2d Cir.1995).

### 1. *The Studley decision*

The parties agree that the Court's decision as to the amount of "loss" attributable to Zeneski turns on its interpretation of U.S.S.G. § 1B1.3 and *Studley*. In *Studley*, the defendant, Brian Studley, pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341. Studley was employed by Pacific Consulting, Inc. ("Pacific"), a telemarketing operation which solicited applications for fraudulent loans, inducing the applicants to pay a $249 application fee when the salesperson knew no loan would be forthcoming. Studley was one of approximately twenty phone representatives who solicited applications. All twenty phone representatives sat together in one room while they worked. Each representative knew what the others were doing. It was estimated that during the life of the operation, Pacific received $273,153 in application fees.

Studley was sentenced to ten months of incarceration. This sentence was based in part on this Court's interpretation of U.S.S.G. § 1B1.3(a)(1)(B) which provides,

> adjustments ... shall be determined on the basis of the following:

> > in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

This Court held Studley accountable for the entire loss, finding that Studley's role in the scheme was part of a "jointly undertaken activity" which was reasonably foreseeable under U.S.S.G. § 1B1.3(a)(1)(B). As stated above, the salespeople worked together in the same room as part of single scheme and each participant knew what the others were doing. Accordingly, Studley's offense level was enhanced based on the entire sum of $273,153.

On appeal, the Second Circuit reversed. The appellate court held that "[p]ursuant to [section 1B1.3], if a defendant participates in 'jointly undertaken criminal activity,' he or she may be sentenced based on criminal acts committed by other participants if the acts were committed in furtherance of the jointly undertaken activity and could reasonably have been foreseen by the defendant." *Studley*, 47 F.3d at 573, citing, *United States v. Tapia–Ortiz*, 23 F.3d 738, 742–43 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 206, 130 L.Ed.2d 136 *and cert. denied*, —— U.S. ——, 115 S.Ct. 286, 130 L.Ed.2d 201 (1994). For guidance in interpreting the phrase "jointly undertaken activity" the court looked to section 1B1.3 Application Note Two which sets forth the following two prong test:

> A "jointly undertaken criminal activity" is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in

concert with others, whether or not charged as a conspiracy.

In the case of jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omission) of others that was both:

(i) in furtherance of the jointly undertaken activity; and

(ii) reasonably foreseeable in connection with that activity.

Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken ... is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake.

Employing Application Note Two, the Second Circuit reasoned that in order for a defendant to be held accountable for the acts of others, the district court must make two specific findings: (1) the acts undertaken must be within the scope of the agreement, and (2) the acts must have been foreseeable by the defendant. In determining the "scope of the agreement," the district court may consider any "explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Studley,* 47 F.3d at 575, citing, U.S.S.G. § 1B1.3 Applic.Note 2. In determining the "scope of the agreement" the Second Circuit reviewed three of the eight illustrations contained in Application Note 2 and developed the following propositions:

1. A defendant's mere knowledge of another participant's criminal acts is not enough to hold the defendant responsible for those criminal acts. *Id.,* citing, Illus. (c)(6).

2. The fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation. The relevant inquiry is what role the defen-

dant agreed to play in the overall scheme either by an explicit agreement, or implicitly by his conduct.

3. Relevant factors in determining whether activity is jointly undertaken includes:

a. whether the participants pool their profits and resources, or whether they work independently, *id.,* citing, Illus. (c)(6), and

b. whether the defendant assisted in designing and executing the illegal scheme. *Id.,* citing, Illus. (c)(2).

Applying these rules, the Second Circuit found that Studley was not responsible for the entire amount of the loss because he did not agree to jointly undertake the entire operation. He did not design or develop the telemarketing plan. There was no evidence that he worked to further the scheme other than his sales efforts. He was paid on a commission basis, receiving no share of the profits, and he never assisted any of the other representatives with their sales. While there was ample evidence that Studley knew of the other participants' role in the criminal activity, this fact alone could not hold him accountable for the other participants' unlawful acts. Accordingly, the appellate court found that "Studley's agreement to participate in the fraudulent scheme was limited to his own fraudulent activity and did not encompass the fraudulent activity of the other representatives." *Studley,* 47 F.3d at 576.

Applying the rules set forth in *Studley,* Zeneski contends that he should not be held accountable for the entire loss resulting from the credit card fraud conspiracy. In support of his position, Zeneski asserts that the conspiracy consists of two components: (1) the unlawful trafficking of stolen credit card numbers; and (2) the fraudulent use of the credit card numbers to purchase computer equipment. While Zeneski concedes that he participated in the former conduct, he denies that he should be held accountable for the latter activities. Zeneski emphasizes that his role in the conspiracy was to obtain credit card numbers and give them to Marino. He took no part in the fraudulent purchase of the computer equipment. In exchange for the credit card numbers, Zeneski received

approximately $3,500 worth of computer equipment. Conceding that it would be foreseeable that the stolen credit card numbers were to be used to illegally purchase computer equipment, the defendant contends that he should be sentenced based only on the $3,500 worth of computer equipment he received.

On the other hand, the Government contends that this case is distinguishable from *Studley.* In *Studley,* the defendant was a telemarketing representative content to exploit his own customers as a cog in a greater operation. Studley never contributed any resources to the operation and Studley's participation was not critical to the success of the criminal activity involved, namely the overall mail fraud scheme. In this case however, the Government argues that the defendant provided the credit card numbers upon which the entire criminal activity was based. Without Zeneski's participation, the conspiracy could not succeed. In addition, the fraudulent use of the credit card numbers to obtain computer equipment was concededly foreseeable. As the defendant admits, he originally provided Marino with 186 stolen credit card numbers, a large enough supply to make a $198,714 loss reasonably predictable. Moreover, at the time of his arrest, Zeneski had another 64 stolen credit card numbers which he was prepared to deliver. Therefore, the Government contends that the two prong test for jointly undertaken criminal activity set forth in *Studley* is satisfied.

### 2. *Zeneski's sentencing*

Before applying the principles of law enunciated in *Studley,* one more proposition must be added to those set forth above. As already discussed in its decision, the Second Circuit used the illustrations accompanying the Application Notes as guidance in the interpretation of section 1B1.3. In *Studley,* the Court of Appeals considered illustrations (c)(2), (c)(6) and (c)(7). In addition to the rules derived from those illustrations, the Court now finds that illustration (c)(3) is also relevant to this sentencing inquiry.

Illustration (c)(3) provides the following example:

> Defendants H and I engaged in an ongoing marihuana importation conspiracy in which defendant J was hired only to help off-load a single shipment. Defendants H, I and J are included in a single count charging conspiracy to import marihuana. Defendant J is accountable for the entire single shipment of marihuana he helped import under subsection (a)(1)(A) and any acts and omissions in furtherance of the importation of that shipment that were reasonably foreseeable (*see* the discussion in example (a)(1) above). He is not accountable for prior or subsequent shipments of marihuana imported by Defendants H or I because those acts were not in furtherance of his jointly undertaken criminal activity (the importation of the single shipment).

U.S.S.G. § 1B1.3, Applic.Note 2, Illus. (c)(3).

■ Illustration (c)(3) adds one important proposition to the *Studley* rules. When a defendant is hired to play a role necessary to the completion of a criminal episode, he will be held liable for all other acts necessary to the completion of that episode. This is demonstrated by the fact that although H and I are engaged in the continuous conspiracy, and therefore liable for all shipments, J, as a necessary participant in the single shipment, namely the party responsible for the physical act of unloading the marihuana, is liable for the entire shipment. There is no indication that J is liable only for the amount he was paid for his participation. Moreover, the illustration does not state or imply that J would not be responsible for the entire amount of marihuana subsequently sold because he played no role in the marihuana's ultimate sale or distribution. Because his unloading the marihuana was a necessary component for the completion of importing the single shipment, J was responsible for the value of the entire shipment.

■ Applying this proposition, in addition to those set forth in *Studley,* the Court now finds that the defendant is liable for the entire amount of the loss, namely the sum of $198,714. While it is true that the mere fact that Zeneski knew about the fraudulent use of the credit cards is not enough to hold him accountable for that use, the defendant's role in the conspiracy amounts to more than knowledge, and more than mere facilitation.

48

In accordance with the requirements of *Studley,* the Court now expressly finds that Zeneski jointly agreed to participate in the fraudulent use of the credit card numbers when he agreed to steal them. The scope of the defendant's agreement with Marino implicitly included the fraudulent use of the stolen credit card numbers. Unlike the defendant in *Studley,* who did not "contribute[ ] resources to the telemarketing scheme," *see Studley,* 47 F.3d at 576, Zeneski provided the single most critical resource to the conspiracy. He stole the credit card numbers. Without his specialized computer knowledge and participation, the credit card numbers would not have been available and the fraudulent use of those credit card numbers could not have occurred. In *Studley,* the defendant was also one of many telephone salespersons in a telemarketing scheme. If Studley was never employed by the telemarketing company, the fraudulent scheme would have continued in his absence. In this case, Zeneski was an integral and indispensable component of the conspiracy.

In addition the Court finds that the fraudulent use of the credit card numbers was foreseeable. Zeneski stole the credit card numbers from hotel computer systems at the request of Marino. In exchange for the first 186 credit card numbers Zeneski received approximately $3,500 worth of computer equipment. As the defendant concedes in his earlier correspondence with the Court, purchase of this computer equipment by fraudulent use of the credit cards was foreseeable. However, the Court now finds that not only was the fraudulent use of the credit card numbers to purchase the computer equipment for Zeneski foreseeable, but the fraudulent use of the credit card numbers to obtain all the goods purchased was also foreseeable. A contrary conclusion would be tantamount to finding that while Zeneski originally stole and delivered 186 credit card numbers, which were used to steal the sum of $198,714 in computer parts, his accountability for the thefts that followed should be limited because he did not profit from all of the equipment stolen. The Court is unwilling to interpret the sentencing guidelines so narrowly.

Accordingly, the Court finds that: (1) that Zeneski jointly undertook to steal the credit card numbers at issue and agreed to their fraudulent use, (2) that such fraudulent use of the stolen credit card numbers falls within the scope of his agreement with Marino, and (3) that such use of the credit card numbers was foreseeable. The Court now concludes that the Government proved, by a preponderance of the evidence, that the seven level upward adjustment recommended by the Probation Department holding the defendant responsible for the entire loss of $198,714, is correct.

III. *Conclusion*

After reviewing the submissions by both parties, and hearing oral argument, and for the reasons set forth in the record, it is hereby

ORDERED, that the recommendation of the Probation Department for an upward adjustment of seven levels pursuant to U.S.S.G. § 2F1.1(B)(1)(I) is upheld and applies to the defendant, Andrew Zeneski, Jr. as the result of his participation in this conspiracy to commit credit card fraud; and is hereby

ORDERED, that the total offense level to be applied in the sentencing of the defendant is thirteen, yielding a sentence of incarceration twelve to eighteen months.

SO ORDERED.