**CITY OF MAPLE HEIGHTS, Appellant,**

v.

**EPHRAIM, Appellee.**

[Cite as *Maple Hts. v. Ephraim,* 178 Ohio App.3d 439, 2008-Ohio-4576.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 90237.

Decided Sept. 11, 2008.

Melling, Harding & Montello and John J. Montello, for appellant.

Robert L. Tobik, Cuyahoga County Public Defender, and Jeffrey B. Lazarus and John T. Martin, Assistant Public Defenders, for appellee.

MELODY J. STEWART, Judge.

{¶ 1} In this case of first impression, we are asked to rule on the legality of a municipal ordinance that holds the parent or legal guardian of a child under the age of 18 criminally liable, in the absence of intent or action, if that child commits a delinquent act that would be considered a felony or misdemeanor if committed by an adult. Appellant city of Maple Heights charged defendant-appellee Thelma Ephraim with a violation of its "parental responsibility" ordinance after her 17–year–old son had been arrested and charged with offenses that would be felonies if committed by an adult. The municipal court declared the ordinance unconstitutional because it was vague and overbroad and conflicted with state law. The city appeals.

I

{¶ 2} The facts are undisputed for purposes of appeal. A police report showed that officers were dispatched to investigate a report of "a group of people fighting." When they arrived on the scene, they saw a car driven by Ephraim's son in the intersection of the street, with all four of its doors open. The

occupants of the car shut their doors and drove away when they saw the police car. When the son failed to signal a lane change, the police activated their overhead lights in order to make a traffic stop. The son rapidly accelerated in an attempt to flee from the police. He drove through three stop signs before losing control of the car and sideswiping a tree. The officers stopped their car and tried to apprehend the occupants. The son fled on foot despite an officer's orders for him to stop. The officers apprehended him and took him face-down to the ground. The son resisted their attempts to handcuff him by moving his hands beneath and towards the waistband of his pants. After handcuffing him, the officers searched him and found a loaded .25 caliber semi-automatic handgun in a front pocket of his pants.

{¶ 3} The city charged Ephraim under Maple Heights Ordinance 648.20, titled "Parental Responsibility to Supervise a Minor," which states:

{¶ 4} "(a) A person commits the offense of failing to supervise a minor if: the person is the parent, legal guardian, or person with legal responsibility for the safety and welfare of a child under 18 years of age, and the child has committed a status offense,[1] unruly act or a delinquent act that would be a misdemeanor or felony of any degree if committed by an adult.

{¶ 5} "(b) It shall be a defense to the offense of failure to supervise a minor if the person took reasonable steps to control the conduct of the child at the time the person is alleged to have failed to supervise.

{¶ 6} "(c) In addition to any fine or penalty imposed pursuant to this section, the court may order the person to pay restitution to a victim of the minor's conduct. The amount of restitution ordered pursuant to this section shall not exceed three thousand dollars ($3,000).

{¶ 7} "(d) Whoever violates division (a) of this section is guilty of failing to supervise a minor, a minor misdemeanor for a first offense. For a second offense, such person is guilty of a misdemeanor of the fourth degree. For a third and subsequent offense, such person is guilty of a misdemeanor of the first degree. The penalty shall be as provided in Section 698.02.

{¶ 8} "(e) The first time a person is convicted of an offense described in division (a), the person shall not be required to pay a fine (other than court costs) if the person successfully participates and completes a parent effectiveness program to the satisfaction of the court."

---

1. Status offenses are acts for which only juveniles can be arrested, that is, an otherwise legal act that is considered illegal only because of the juvenile status of the person committing the act. See R.C. 2151.022. Status offenses include truancy, unruly behavior, and liquor-law violations (minor in possession of alcohol, underage drinking).

{¶ 9} Ephraim filed a motion to dismiss the indictment on grounds that the city's parental responsibility ordinance violated her right to due process and was vague and overbroad. The court heard arguments on the motion and then issued a written opinion in which it found the ordinance unconstitutional because it conflicted with state law, specifically, R.C. 2901.21(A). That section states:

{¶ 10} "(A) Except as provided in division (B) of this section, a person is not guilty of an offense unless both of the following apply:

{¶ 11} "(1) The person's liability is based on conduct that includes either a voluntary act, or an omission to perform an act or duty that the person is capable of performing;

{¶ 12} "(2) The person has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense." The court held that the ordinance allowed a person to be convicted without either a voluntary act or an omission to perform an act or duty that the person is capable of performing. The court also found that the ordinance was vague because it granted the city's prosecuting attorney too much latitude in deciding when to charge a person with violating the ordinance. Finally, the court held that the ordinance overbroadly included all parents, regardless of whether a particular parent had actual oversight of the child at the time the child committed the delinquent act.

## II

{¶ 13} Because it is a basic principle of appellate review that we should avoid deciding questions of constitutional law if a case can be decided on nonconstitutional grounds, see *Kinsey v. Police & Firemen's Disability & Pension Fund Bd. of Trustees* (1990), 49 Ohio St.3d 224, 225, 551 N.E.2d 989, we begin with the city's argument that the court erred by finding the ordinance to be preempted by Ohio law. The court held that the ordinance permitted the imposition of strict liability, even though it failed to specify any voluntary act or omission to act on the part of the accused.

## A

{¶ 14} Section 3, Article XVIII of the Ohio Constitution (the "Home Rule Amendment") states that municipalities are authorized "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 15} An ordinance is in "conflict" with general laws when it allows that which the statute does not, and vice versa. *Struthers v. Sokol* (1923), 108

Ohio St. 263, 140 N.E. 519, paragraph two of the syllabus. See also *State v. Burnett* (2001), 93 Ohio St.3d 419, 431, 755 N.E.2d 857. Conflicts between state and local laws are not lightly found—"in order for such a conflict to arise, the state statute must positively permit what the ordinance prohibits, or vice versa, regardless of the extent of state regulation concerning the same object." *Cincinnati v. Hoffman* (1972), 31 Ohio St.2d 163, 169, 60 O.O.2d 117, 285 N.E.2d 714.

{¶ 16} In *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 17, the Supreme Court stated:

{¶ 17} "We use a three-part test to evaluate claims that a municipality has exceeded its powers under the Home Rule Amendment. 'A state statute takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the police power, rather than of local self-government, and (3) the statute is a general law.' *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 9. Although it may seem that the three issues should be taken in sequence as stated, we must examine the two legislative enactments before determining whether a conflict exists. Thus, the Canton test should be reordered to question whether (1) the ordinance is an exercise of the police power, rather than of local self-government, (2) the statute is a general law, and (3) the ordinance is in conflict with the statute."

### B

{¶ 18} When considering whether the ordinance is an exercise of the police power, rather than of local government, we acknowledge that "[i]f an allegedly conflicting city ordinance relates solely to self-government, the analysis stops, because the Constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction." *Am. Fin. Servs. Assn. v. Cleveland,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 23. In *Marich v. Bob Bennett Constr. Co.,* 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, ¶ 11, the Supreme Court stated:

{¶ 19} "An ordinance created under the power of local self-government must relate 'solely to the government and administration of the internal affairs of the municipality.' *Beachwood v. Cuyahoga Cty. Bd. of Elections* (1958), 167 Ohio St. 369, 5 O.O.2d 6, 148 N.E.2d 921, paragraph one of the syllabus. Conversely, the police power allows municipalities to enact regulations only to protect public health, safety, morals, or the general welfare * * *. See *Downing v. Cook* (1982), 69 Ohio St.2d 149, 150, 23 O.O.3d 186, 431 N.E.2d 995. While local self-government ordinances are protected under Section 3, Article XVIII of the Ohio Constitution, police-power ordinances 'must yield in the face of a general state law.' *Am. Fin. Servs. Assn.,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 23."

{¶ 20} There is nothing in the Maple Heights ordinance that suggests it is related "solely" to the city's government and internal affairs. We therefore consider whether it is validly enacted under the city's police power.

{¶ 21} The police power has been said to have originated "in the inherent need of government to impose certain restraints on the private actions of citizens for the benefit of all." (Footnote omitted.) Hodge, The Role of New Federalism and Public Health Law (1997), 12 J.L. & Health 309, 320. The rationale for the police powers is:

{¶ 22} "Where individual actions or other elements constitute threats to the public welfare, governments should be able to use their powers to reduce, deter, or enjoin the resulting harms to society. In order for individuals to exist peacefully and beneficially in societal groups, governments must be able to control individual rights and uses of property in the interests of increasing the benefits and reducing societal drawbacks. Sovereign police powers represent as much a grant of power to governments from the people as they do an inherent attribute of governmental power over the people. 'The public welfare demands that the rights of the individual give way to those of the people as a whole.' " (Footnotes omitted.) Id.

{¶ 23} The police power "extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the state." *Marmet v. State* (1887), 45 Ohio St. 63, 70, 12 N.E. 463. In *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 47, 616 N.E.2d 163, the Supreme Court stated:

{¶ 24} "Legislative concern for public safety is not only a proper police power objective—it is a mandate." The police power of the state is premised not only on protecting the "public health, safety, morals and general welfare," but "in promoting the comfort, convenience and peace of mind" of its citizens. See *Ghaster Properties, Inc. v. Preston* (1964), 176 Ohio St. 425, 435, 200 N.E.2d 328. See also *State v. Thompkins* (1996), 75 Ohio St.3d 558, 560, 664 N.E.2d 926 (the General Assembly has the authority, under the state's police powers, to enact laws defining criminal conduct and to prescribe its punishment).

{¶ 25} Statistical data show that juvenile crime is a matter that affects the public health, safety, morals, and general welfare. Statistics compiled by the Federal Bureau of Investigation show that in 2006, there were 1,382,848 arrests of persons under 18 years of age. See Federal Bureau of Investigation, Crime in the United States Annual Report 2006. During that same year, the Ohio Office of Criminal Justice Services reported a total of 42,134 arrests in Ohio. See Ohio Department of Public Safety, Ohio Office of Criminal Justice Services, 2006 Juvenile Arrests in Ohio by Crime Type, available at http://www.crimestats.ohio. gov/CrimeByCounty2006.pdf. The Office of Criminal Justice Services reported

that in 2006, the city of Maple Heights had 229 juvenile arrests. See Ohio Department of Public Safety, Ohio Office of Criminal Justice Services, Crime by County 2006 Statistics, available at http://www.crimestats.ohio.gov/CrimeBy County2006.pdf.

{¶ 26} Statistics show that the number of juvenile crimes decreased seven percent between 1995 and 2004. See OJJDP Fact Sheet: Delinquency Cases in Juvenile Courts, 2004 (Feb. 2008, No. 01), United States Department of Justice Office of Juvenile Justice, available at (http://www.ncjrs.gov/pdffiles1/ojjdp/fs 200801.pdf). However, more recent data compiled by the FBI show that in 2006, there was a 0.8 percent increase in juvenile arrests over 2005, and that "[a]rrests of juveniles (under 18 years of age) for murder rose 3.4 percent in 2006 compared with 2005 arrest data; for robbery, arrests of juveniles increased 18.9 percent over the same 2–year period." Crime in the United States Annual Report 2006, Table 36, available at http://www.fbi.gov/ucr/cius2006/data/table_36.html. The FBI also reported that the number of juvenile arrests for "violent crime," which it defines as "murder and nonnegligent manslaughter, forcible rape, robbery, and aggravated assault," increased by 3.6 percent in 2006. Id.

{¶ 27} By any measure, the number of juvenile arrests is troubling. The FBI estimates that in 2006, 14,380,370 arrests occurred nationwide for all offenses except traffic violations. Id. Juvenile arrests comprised nearly ten percent of all arrests made in 2006. Id.

{¶ 28} Legislative approaches to the prevention of juvenile crime have typically involved "1) increasing penalties, including finite and lengthier periods of incarceration for young offenders; 2) lowering the age and other prerequisites for transferring juveniles accused of serious crimes from juvenile to adult court (where adult sanctions can be imposed); and 3) funding new detention and correctional centers as well as 'boot camps' with rigid, military-like regimens." Davidson, No Consequences—Reexamining Parental Responsibility Laws (1995), 7 Stan.L. & Policy Rev. 23. These methods, however, do not address why a juvenile becomes an offender.

{¶ 29} Various theories addressing the cause of juvenile offending have been developed over the years. See Note, To Enhance or Not to Enhance: Civil Penalty Enhancement for Juvenile Hate Crime Offenders (2007), 41 Val.U.L.Rev. 1685, 1709. One theory, positive causation theory, attributes crime to the offender's background and environment, including "personal, social, or environmental factors [that] contribute to juvenile delinquency." Note, Creating Problems Rather Than Resolving Them: Why Criminal Parental Responsibility Laws Do Not Fit Within Our Understanding of Justice (1997), 66 Fordham L.Rev. 1029, 1035–1036. Consistent with this theory, some criminologists have concluded that " 'certain functions and characteristics of the family are among the

primary causes of juvenile delinquency' " and that " 'delinquency is a product of family inadequacy or malfunctioning.' " Note, Holding Parents Criminally Responsible for the Delinquent Acts of their Children: Reasoned Response or "Knee–Jerk Reaction"? (1997), 23 J.Contemp.L. 401, 411, quoting Schafer & Knudten, Juvenile Delinquency: An Introduction (1970) 191. Hence, parental responsibility laws gained popularity throughout the country.

{¶ 30} The data permit no firm conclusions as to whether parental responsibility laws are efficacious. Nevertheless, "the object of a criminal penalty is to punish the accused, deter others from crime, and to protect the public." *State v. Meyer* (1955), 163 Ohio St. 279, 287, 56 O.O. 256, 126 N.E.2d 585. The city maintains that the ordinance furthers the goal of reducing juvenile crime by holding parents accountable for the conduct of their children. We therefore find that the city's enactment of an ordinance designed to hold parents responsible for the criminally culpable actions of a child is a valid exercise of the police power.

### C

{¶ 31} We next consider whether R.C. 2901.21(A) is a general law. In *Canton,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, the syllabus sets forth a four-part test to determine whether statutes are general laws:

{¶ 32} "To constitute a general law for purposes of home-rule analysis, a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally."

{¶ 33} There is no question that R.C. 2901.21(A) is a general law. It is contained within R.C. Title 29, it applies to all parts of the state, sets forth a police regulation, and prescribes a rule of conduct upon all citizens generally.

### D

{¶ 34} The crucial issue for consideration is whether the ordinance conflicts with R.C. 2901.21(A). In *Cincinnati v. Baskin,* 112 Ohio St.3d 279, 859 N.E.2d 514, 2006-Ohio-6422, ¶ 19–20, the Supreme Court stated:

{¶ 35} "It has long been established that '[i]n determining whether an ordinance is in "conflict" with general laws, the test is whether the ordinance permits or licenses that which the statute forbids or prohibits, and vice versa.' *Struthers*

*v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, at paragraph two of the syllabus. See, also, *State v. Burnett* (2001), 93 Ohio St.3d 419, 431, 755 N.E.2d 857; *Middleburg Hts. v. Ohio Bd. of Bldg. Standards* (1992), 65 Ohio St.3d 510, 512, 605 N.E.2d 66. In other words, '[n]o real conflict can exist unless the ordinance declares something to be a right which the state law declares to be wrong, or vice versa." *Sokol,* 108 Ohio St. at 268, 140 N.E. 519.

{¶ 36} "It is also well established that 'in order for such a conflict to arise, the state statute must positively permit what the ordinance prohibits, or vice versa, regardless of the extent of state regulation concerning the same object.' *Cincinnati v. Hoffman* (1972), 31 Ohio St.2d 163, 169, 60 O.O.2d 117, 285 N.E.2d 714. See, also, *State ex rel. King v. Summit Cty. Council,* 99 Ohio St.3d 172, 2003-Ohio-3050, 789 N.E.2d 1108, at ¶ 39; *Cleveland v. Raffa* (1968), 13 Ohio St.2d 112, 114, 42 O.O.2d 329, 235 N.E.2d 138."

{¶ 37} R.C. 2901.21(A) embodies the long-recognized principle that a crime is composed of both an actus reus and a mens rea—the voluntary act (or the failure to act when required to do so) and the requisite mental state to commit that act. *State v. Colon,* 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, at ¶ 10.

{¶ 38} In some circumstances, the mens rea requirement is inapplicable; for example, in strict-liability offenses. The violation of a strict-liability crime imposes criminal liability on the defendant in the absence of criminal intent or mens rea. See *United States v. Bailey* (1980), 444 U.S. 394, 404, 100 S.Ct. 624, 62 L.Ed.2d 575, fn. 4; *State v. Moore,* Cuyahoga App. No. 83692, 2004-Ohio-5732, 2004 WL 2425538, ¶ 16. For example, strict liability has been imposed for the sale of alcohol to a minor, R.C. 4301.69, and for voting illegally in Ohio elections, R.C. 3599.12. See *State v. Collins* (2000), 89 Ohio St.3d 524, 532, 733 N.E.2d 1118 (Lundberg Stratton, J., concurring in part and dissenting in part) (collecting cases).

{¶ 39} Strict liability may also be imposed when the harm does not consist of a wrongful act, but of a failure to act at all. The law imposes strict liability upon sexual offenders who fail to register as a sexual offender in violation of R.C. 2950.04, see *State v. Beckley,* Cuyahoga App. No. 83254, 2004-Ohio-2977, 2004 WL 1277358, and upon dog owners who fail to keep a dog physically confined or restrained upon the owner's premises. R.C. 955.22(C); *Gates Mills v. Welsh* (2001), 146 Ohio App.3d 368, 766 N.E.2d 204. In such cases the omission to act constitutes the actus reus. Vicarious liability, however, imputes the acts of one person to another. This theory of criminal responsibility most often applies to corporate entities for acts of their employees, usually under the agency theory of respondeat superior. See *New York Cent. & Hudson River RR. Co. v. United*

*States* (1909), 212 U.S. 481, 494, 29 S.Ct. 304, 53 L.Ed. 613 (borrowing concepts from tort law of respondeat superior to hold that "the act of the agent, while exercising the authority delegated to him to make rates for transportation, may be controlled, in the interest of public policy, by imputing his act to his employer and imposing penalties upon the corporation for which he is acting in the premises").

{¶ 40} Corporate criminal liability and the vicarious liability it imposes "is a substantial departure from the ordinary rule that a principal is not answerable criminally for the acts of his agent without the principal's authorization, consent or knowledge, and thus corporate criminal liability continues to be a matter of vigorous debate." (Footnotes omitted.) 1 LaFave & Scott, Substantive Criminal Law (1986) 364, Section 3.10(b). See also *Comer v. Risko,* 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 17 (rejecting the imposition of vicarious liability upon a principal for the acts of independent contractors as "radically" departing from basic agency principles).

{¶ 41} The common law did not allow the invocation of the doctrine of respondeat superior in a criminal case because it would run counter to the notion that guilt must be individual and through personal causation:

{¶ 42} "The common law is wedded to the concept of personal, rather than vicarious, responsibility for crimes. [One commentator] has described the notion that criminal liability is 'intensely personal' as 'deeply rooted.' Our demand that responsibility be personal is the result of the 'inarticulate, subconscious sense of justice of the [person] on the street.' Personal responsibility is the 'only sure foundation of law.' Causation, then, is the instrument we employ to ensure that responsibility is personal. It links the actor to the harm. It helps us to understand who should be punished by answering how the harm occurred. Causation is * * * 'an ultimate notion, deeply characteristic of human thought and expressed even among the most primitive people, in their effort to understand the "way of things." ' " (Footnotes omitted.) Dressler, Reassessing the Theoretical Underpinnings of Accomplice Liability: New Solutions to an Old Problem (1985), 37 Hastings L.J. 91, 103.

{¶ 43} Despite being a departure from generally accepted principles of criminal culpability, vicarious criminal liability is sometimes applied beyond corporations to individuals. In *Pinkerton v. United States* (1946), 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, the United States Supreme Court held that if individuals enter into a conspiracy, they are not only guilty of the conspiracy but each is also vicariously guilty of the crimes committed in furtherance of the conspiracy by any of the other conspirators. Much like the rule of aiding and abetting, the overt acts of one person in a conspiracy are attributable to all

persons in the conspiracy. Id. at 647, 66 S.Ct. 1180, 90 L.Ed. 1489. See also *United States v. Studley* (C.A.2, 1995), 47 F.3d 569, 575.

{¶ 44} Ohio permits the imposition of vicarious criminal liability against organizations under R.C. 2901.23(A)(2) when (1) the General Assembly expresses an intention to impose liability, (2) the act constituting a criminal offense was committed by the employee on behalf of the organization, and (3) the act was within the scope of employment. Ohio does not, however, allow for the imposition of individual vicarious criminal liability under R.C. 2901.21(A).

{¶ 45} The city's ordinance very plainly imposes individual vicarious criminal liability because it does not require that the offender commit any act or omission as a predicate for culpability. An offense is committed by a parent once the child "has committed a status offense, unruly act or a delinquent act that would be a misdemeanor or felony of any degree if committed by an adult." Our conclusion is inescapable: the ordinance allows that which R.C. 2901.21(A) prohibits and is in direct conflict with R.C. 2901.21(A).

{¶ 46} R.C. 2901.21(A) takes precedence over the ordinance, so we invalidate the ordinance as a matter of law and declare it void. See *Marich,* 116 Ohio St.3d 553, 880 N.E.2d 906, at ¶ 42. It follows that the court did not err by granting Ephraim's motion to dismiss the criminal complaint filed against her. Because we can resolve this appeal without addressing the city's constitutional claims, the remaining assignments of error are moot. See *Kinsey,* 49 Ohio St.3d 224, 551 N.E.2d 989; App.R. 12(A)(1)(c).

Judgment affirmed.

GALLAGHER, P.J., concurs.

CELEBREZZE, J., concurs in judgment only.