*United States v. Pica*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2023

(Argued: October 19, 2023          Decided: July 1, 2024)

No. 20-3677

_____

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

ANTHONY PICA,

*Defendant-Appellant.*

_____

Before:      LIVINGSTON, *Chief Judge*, KEARSE and CARNEY, *Circuit Judges*.

Defendant-Appellant Anthony Pica challenges his sentence of 264 months' imprisonment, following a jury trial, on the basis that the United States District Court for the Eastern District of New York (Amon, *J.*) erroneously applied U.S.S.G. § 2A1.1, the Sentencing Guideline for first-degree murder, in sentencing him. Having been convicted of conspiracy to commit robbery and attempted robbery, Pica argues that the district court should have sentenced him under U.S.S.G. § 2B3.1. We hold that the district court properly applied U.S.S.G. § 2A1.1, pursuant to U.S.S.G. § 2B3.1(c)'s cross-reference thereto, based on its

1

determination that a co-participant's act of murdering the robbery victim was relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, the amended judgment of the district court is **AFFIRMED**.

FOR APPELLEE:                        FRANK TURNER BUFORD, Assistant United States Attorney (Susan Corkery, Assistant United States Attorney, *on the brief*), *for* Breon Peace, United States Attorney for the Eastern District of New York, Brooklyn, NY.

FOR DEFENDANT-APPELLANT:            MATTHEW B. LARSEN, Federal Defenders of New York Appeals Bureau, New York, NY.

DEBRA ANN LIVINGSTON, *Chief Judge*:

In this appeal from an amended judgment of the United States District Court for the Eastern District of New York (Amon, *J.*) sentencing Anthony Pica principally to 264 months' imprisonment, we consider whether a co-participant's fatal assault on the victim during the course of an armed robbery is relevant conduct, within the meaning of United States Sentencing Guideline ("U.S.S.G.") § 1B1.3(a)(1)(B), that can be attributed to the defendant for sentencing purposes.[1]

---

[1] Guideline 1B1.3(a)(1)(B) specifies that relevant conduct includes:

in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were–

(i) within the scope of the jointly undertaken criminal activity,

(ii) in furtherance of that criminal activity, and

Considering the facts of this case, we conclude that it is. We therefore **AFFIRM** the district court's amended judgment sentencing Pica to a 264-month term of imprisonment.

## BACKGROUND

### I. Factual Background[2]

The relevant facts underlying Pica's conviction and sentence are undisputed. Pica, Salvatore Maniscalco, Jr., and John Delutro learned on a day late in April 2008 that Louis Antonelli, a jeweler, would have with him a large amount of jewelry and cash later that day. They set out to rob Antonelli of those possessions. Shortly before the robbery attempt, Maniscalco and Delutro surveilled the intersection of Broadway and Castleton Avenue in Staten Island and determined that Antonelli could be approached as he exited a basement storage area at this location. Based on this surveillance, Pica collaborated with Maniscalco and Delutro to formulate a plan.

---

(iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

[2] The factual background presented here is derived from the parties' submissions, uncontroverted testimony presented at sentencing, and Pica's revised presentence report ("PSR").

3

Tasked with assembling the robbery team, Pica reached out to his childhood friend, Christopher Prince, and together they recruited Charles Santiago—who was known as a "wild, hot-headed" individual—to participate in the robbery. PSR ¶ 8. Pica drove with Prince to Santiago's home. In his initial conversation with Pica, Santiago indicated that he had a gun. Santiago then brought the gun out to Prince's car, which prompted Pica to suggest that Santiago drive in a separate vehicle to the location of the planned robbery. Pica and Prince subsequently recruited Joseph Gencarelli, another of Pica's friends, to drive Santiago to the site. While Pica understood that Santiago would use the gun to "stick up" Antonelli, *id.* ¶ 9, Pica told Santiago that Antonelli was not to be harmed because he was an "earner," *id.* ¶ 8.

Pica, Prince, Santiago and Gencarelli were present during the robbery attempt. Santiago, carrying the gun, drove to the location with Gencarelli; Pica and Prince drove separately in their own vehicle. The plan was for Pica and Prince to serve as look-outs for law enforcement, while Santiago and Gencarelli robbed Antonelli of his possessions. In terms of executing the robbery, Santiago was to use the gun to "stick up" Antonelli as he exited the storage basement and

4

approached his parked car. *Id.* ¶ 9. Meanwhile, Gencarelli would seize the jewelry.

Upon arriving at the location of the planned robbery, Santiago and Gencarelli approached Antonelli's car but hesitated when they noticed items bearing the logo of the New York Police Department inside the vehicle. Concerned about Antonelli's potential affiliation with the police and the possible presence of law enforcement in the area generally, Santiago and Gencarelli returned to Gencarelli's car and called Prince and Pica to ask whether they should continue with the robbery. Pica directed them to proceed.

Soon thereafter, Pica tipped off Santiago and Gencarelli that Antonelli would be exiting the storage basement. After once again leaving Gencarelli's car, Santiago and Gencarelli approached Antonelli as he arrived at his vehicle. While Gencarelli looked for jewelry in Antonelli's car, Santiago pointed his gun at Antonelli and instructed him to refrain from "do[ing] anything stupid" or from moving. *Id.* ¶ 11. When Antonelli disregarded these warnings, Santiago shot him twice. Santiago and Gencarelli then fled the scene, without any jewelry or cash, communicating by cell phone to Pica and Prince that they should do the same. Antonelli later died from his gunshot wounds.

## II. Procedural Background

### A. Pica's Convictions and Initial Sentencing

Pica was convicted, following a jury trial, of four offenses: (1) conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count One); (2) attempted Hobbs Act robbery, also in violation of § 1951(a) (Count Two); (3) using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Three); and (4) causing the death of another during the commission of a violation of § 924(c), in violation of 18 U.S.C. § 924(j) (Count Four). As to Counts One, Two, and Four, the district court imposed a concurrent sentence of 240 months' imprisonment. As to Count Three, the district court sentenced Pica to 120 months' incarceration, to run consecutively to the 240-month term.

At Pica's sentencing hearing, the district judge emphasized that the conduct for which Pica was convicted—"a robbery in which a man's life was taken"—was "extraordinarily serious." App'x at 43. The district court discussed Pica's "substantial role" in orchestrating the attempted robbery. *Id.* at 44. While the district judge stated that she did not "believe . . . that it was Mr. Pica's intention that the weapon be used," Pica nevertheless "clearly understood, in directing that [a gun] be taken, that [the use of that gun] was a serious and distinct possibility."

6

*Id.* Thus, because "that possibility came to fruition," the district court concluded that "Mr. Pica bears responsibility for that." *Id.*

In sentencing Pica, the district court relied on the Guidelines range that had been set forth in Pica's PSR. Neither party objected to the district court's use of the PSR to sentence Pica. The PSR first discussed § 2B3.1, the Guideline applicable to Hobbs Act robbery, and concluded that the murder of Antonelli was relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B). As a result, the PSR applied Guideline 2B3.1(c)'s cross-reference to Guideline 2A1.1, the first-degree murder Guideline, in calculating Pica's Guidelines range. The application of Guideline 2A1.1, with its base offense level of 43, resulted in a recommended life sentence.

Pica appealed to this Court. Without challenging his 360-month sentence, Pica argued that the judgment of conviction should be vacated on the grounds that the district court made various evidentiary errors at trial and that the government presented insufficient evidence to support Count Four. Finding no merit to these arguments, we affirmed the district court's judgment.

### B. Pica's Second Sentencing Proceeding

Pica thereafter filed a petition pursuant to 28 U.S.C. § 2255 to vacate his convictions on Counts Three and Four based on new precedent from the United

7

States Supreme Court. On March 17, 2020, the district court granted Pica's petition, concluding that in light of the Supreme Court's decision in *United States v. Davis*, 588 U.S. 445 (2019), Pica's convictions for conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery could no longer serve as predicate crimes of violence for purposes of his convictions under 18 U.S.C. § 924(c) and 924(j). Accordingly, the district court vacated Pica's convictions on Counts Three and Four and ordered a resentencing hearing.

The district court held the resentencing hearing on September 24, 2020. At the hearing, the district judge indicated that the Guidelines range had not changed from Pica's initial sentencing, resulting in a recommended life sentence. This was consistent with the calculation in Pica's updated PSR, which again set Pica's Guidelines range with reference to Guideline 2A1.1, the first-degree murder Guideline.[3] The district judge explained that its original sentence of 360 months was substantially below the recommended term of life imprisonment due in part to Pica's lack of intent with respect to the murder of Antonelli: "[T]he Court took into account the issue of [Pica's] *mens rea*, the fact that he – it was not his intention

---

[3] The district court recognized that, because Counts One and Two (Pica's remaining convictions) each had a statutory maximum term of 20 years' imprisonment, the Guidelines range was now effectively capped at a 40-year term of imprisonment.

8

that the victim be killed, and the Court took that into account in granting a substantial departure from the Guideline sentence at that time." App'x at 68–69. At the same time, Pica "knew that Santiago was . . . a volatile individual," and the district court's view as to Pica's significant role in the offense had not changed. *Id.* at 69. As at the initial sentencing hearing, neither party objected to the district court's calculation of the Guidelines range.

Noting that "[t]he central facts" of the crime—namely, those pertaining to the attempted robbery and death of the victim—remained the same, the district judge resentenced Pica principally to 264 months' imprisonment.[4] *Id.* at 69–71. Specifically, the district judge imposed a 240-month term of imprisonment as to Counts One and Two, with 24 months on Count Two to run consecutively to the sentence imposed on Count One, with the rest to run concurrently. This appeal followed.

## DISCUSSION

On appeal, Pica challenges the district court's use of Guideline 2A1.1 for first-degree murder in sentencing him, contending that the murder of Antonelli

---

[4] The district court arrived at this sentence after taking into account Pica's efforts at post-offense rehabilitation.

9

was not relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B).  We review for plain error challenges to the district court's calculation of the Guidelines range that are raised, as here, for the first time on appeal.  *See United States v. Bennett*, 839 F.3d 153, 159 (2d Cir. 2016).  Under the plain error standard, Pica must demonstrate that: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected [Pica's] substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  *United States v. McCrimon*, 788 F.3d 75, 78 (2d Cir. 2015) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)).  For the following reasons, we discern no error in the determination that Guideline 2A1.1 is applicable, much less error that is plain.

* * *

The Sentencing Guidelines provide that, "in the case of a jointly undertaken criminal activity," another's act can be considered as relevant conduct in sentencing the defendant when the act is "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."  U.S.S.G.

10

§ 1B1.3(a)(1)(B)(i)–(iii). Pica challenges the first of these three requirements on appeal, arguing that his instruction to Santiago that Antonelli was not to be harmed—combined with the district court's finding that Pica did not intend for Antonelli to die—places Antonelli's murder outside the scope of the attempted armed robbery in which Pica engaged. This argument is without merit.

At the start, we have identified a range of factors that may be relevant in assessing the scope of a jointly undertaken criminal activity, including, *inter alia*, any "explicit agreement or implicit agreement fairly inferred from the conduct" of the defendant and other participants; "whether the participants pool their . . . resources, or whether they work independently"; "whether the defendant assisted in designing *and* executing the illegal scheme"; and "what role the defendant agreed to play in the operation, either by an explicit agreement or implicitly by his conduct." *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995) (citation omitted).

Here, there is no dispute that Pica agreed with others to commit an armed robbery, enlisted co-participants in that attempt, and engaged in it himself, knowing at all relevant times that a gun would be used to coerce the victim to part

11

with his property.[5]   Pica "design[ed] or develop[ed]" the scheme, *id.* at 576,

assembling the robbery team and recruiting Santiago, among others, to execute the

robbery with Pica.   Pica then traveled to the robbery site, pressed Santiago and

Gencarelli to proceed despite their hesitations, and provided them with live

updates on Antonelli's location.   Pica also directly participated in the robbery

attempt, serving as a look-out while Santiago and Gencarelli tried to obtain

Antonelli's possessions.

In such circumstances, and contrary to Pica's present claim, it is not

necessary that Pica *desired* Antonelli to die in order for his murder to constitute

relevant conduct under § 1B1.3(a)(1)(B).   Antonelli's death was not intended by

---

[5] Pica's undisputed role in the robbery attempt distinguishes this case from *Studley*, where we vacated, holding that the district court's findings as to relevant conduct were insufficient to attribute to the defendant "the entire loss caused by the telemarketing operation" for which he worked as a salesman.   47 F.3d at 570.   Despite the defendant's "aware[ness] that the other sales representatives were defrauding customers," the scope of the defendant's jointly undertaken criminal activity did not encompass other representatives' fraudulent activities, given that the defendant "did not design or develop the telemarketing scam," did not "work[] in any way to further the scheme outside of his sales efforts," and rather than "assist[ing] other representatives with their sales," he "compet[ed] *against* the other sales representatives for commissions."   *Id.* at 576.   Here, by contrast, there is no dispute that Pica planned and attempted to execute an armed robbery in which a "wild, hot-headed" co-participant, whom Pica recruited, would obtain the victim's property by brandishing a gun.   PSR ¶ 8.   These facts are sufficient to attribute to Pica the death caused during the armed robbery attempt in which he participated.

Pica, but it was well within the scope of his jointly undertaken criminal activity.

As the district court noted in sentencing him, Pica played "a substantial role" in

orchestrating the robbery attempt, moving it forward knowing full well that "part

of [the] planning" for which he was responsible "included that someone would

have a weapon." App'x at 44; *see also id.* at 69 (noting that the "central facts" at

Pica's first and second sentencing hearings remained the same).

The commentary to § 1B1.3(a)(1)(B), which serves as an aid in interpreting

the Guideline, confirms that Pica's argument lacks merit. *See United States v.*

*Johnson*, 964 F.2d 124, 127 (2d Cir. 1992) (noting that policy statements and

commentary can be used "as interpretive guides to . . . the Guidelines"); *see also*

*Studley*, 47 F.3d at 574–75 (referencing the Application Notes, and the examples

contained therein, in analyzing Guideline 1B1.3(a)(1)(B)). Indeed, the

commentary offers an example of relevant conduct that is not meaningfully

distinguishable from the present case:

> [T]wo defendants agree to commit a robbery and, during the course
> of that robbery, the first defendant assaults and injures a victim. The
> second defendant is accountable for the assault and injury to the
> victim (even if the second defendant had not agreed to the assault and
> had cautioned the first defendant to be careful not to hurt anyone)
> because the assaultive conduct was within the scope of the jointly
> undertaken criminal activity (the robbery), was in furtherance of that
> criminal activity (the robbery), and was reasonably foreseeable in

connection with that criminal activity (given the nature of the offense).

U.S.S.G. § 1B1.3 Application Note 3(D). As with this example, Pica "agree[d] to commit a robbery" with his co-participants, one of whom "assault[ed]" the victim "during the course of that robbery," *id.* Also consistent with the example, Pica "cautioned" his co-participant not to harm the victim, *id.* Pica argues that this example is nonetheless inapposite because it is found in a section of the Application Notes addressing the "Reasonably Foreseeable" prong of the relevant conduct test, rather than the "Scope" prong. In advancing this argument, however, Pica wholly disregards the example's text, which explicitly states that the first defendant's assaultive conduct, in such circumstances, is "within the scope of the jointly undertaken criminal activity." *Id.*

The example's conclusion—that the assault upon and injury to a victim at the hands of one participant in the joint commission of a robbery is relevant conduct as to the others—is fully applicable in this case. As relevant here, Hobbs Act robbery involves obtaining property from another "against his will, by means of actual or threatened force, or violence, or fear of injury . . . ." 18 U.S.C. § 1951(b)(1). From the start, Pica planned the robbery intending the threatened use of deadly force for its accomplishment. In such circumstances, whatever

14

Pica's preferences as to injury to the victim, it was well within "the scope of the specific conduct and objectives embraced by the defendant's agreement" that deadly force might actually be employed, and not just threatened. *Studley*, 47 F.3d at 574 (emphasis omitted) (citation omitted).

Pica's argument to the contrary primarily relies on *United States v. Johnson*, 378 F.3d 230, 239 (2d Cir. 2004), where we held that a co-conspirator's murder of a rival labor coalition member was not within the scope of the defendant's extortion conspiracy. But *Johnson* is factually inapposite. In that case, the defendant agreed to participate in a conspiracy among coalition members to extort money and no-show jobs from contractors at various construction sites over an eight-year period. *Id.* at 234. Towards the end of the conspiracy, in September 1997, a co-conspirator, Eric Mulder, killed a member of a rival labor coalition, Erick Riddick. *Id.* Riddick's murder was possibly unrelated to the extortion conspiracy and occurred in circumstances suggesting that Johnson had minimal—if any—involvement in its commission.

In attributing Riddick's murder to Johnson for sentencing purposes, the district court relied principally on a purported offer of payment from Johnson to Mulder for the Riddick murder. Significantly, we concluded that the record did

15

not establish that Johnson ever offered such a payment. *Id.* at 239. Without the finding that Johnson had paid for Riddick to be murdered, the record evidence only tenuously connected Johnson to Riddick's murder and the murder to the extortion conspiracy. This led us to conclude that the district court erred in determining that the scope requirement had been satisfied. *Id.* The contrasting facts of *Johnson*—and our application of the relevant conduct test in that context—thus reinforce, and in no way undercut, our conclusion that Antonelli's murder was within the scope of Pica's agreement to rob him.

At bottom, Pica's contrary argument—that because he instructed Santiago not to harm the victim and hoped that such harm would not occur, the Antonelli murder falls outside the scope of his "jointly undertaken criminal activity," *see* § 1B1.3(a)(1)(B)—misunderstands the nature of our scope inquiry. Ultimately, Pica planned, agreed to commit, and then actively engaged in the effort to commit an inherently violent crime involving a deadly weapon. *See United States v. McCoy*, 58 F.4th 72, 74 (2d Cir. 2023) (noting that Hobbs Act robbery is categorically a crime of violence). Pica urged the crime forward, knowing that Santiago was armed and would "stick up" the victim that Pica had identified for him. PSR ¶ 9. In such circumstances, Pica cannot argue that Antonelli's murder was not relevant

16

conduct to the crime that Pica himself put in motion. Pica's hope that actual harm to the victim would prove unnecessary does not absolve him of responsibility for the consequences of his jointly undertaken criminal activity.

Finally, Pica argues that the district court failed to make particularized findings as to scope. Pica is correct that well-established precedent in this Circuit requires district courts to make particularized findings as to both scope and foreseeability before attributing the conduct of others to the defendant for sentencing purposes. *See Studley*, 47 F.3d at 574–75; *Johnson*, 378 F.3d at 235–36. First, the district court must determine "the scope of the criminal activity agreed upon by the defendant." *United States v. Mulder*, 273 F.3d 91, 118 (2d Cir. 2001) (citation omitted). Second, if it concludes that the defendant's agreement embraced the conduct at issue, the district court considers whether that conduct was "foreseeable to the defendant." *Id.* (citation omitted). Only if both elements are satisfied can the district court attribute the acts or omissions of a co-participant to the defendant. *See Studley*, 47 F.3d at 574–75.

In the proceedings below, the district court failed to make an explicit finding as to scope. We decline to remand on this basis, however, having concluded that the district court's factual findings indisputably establish that the murder of

17

Antonelli was within the scope of Pica's agreement to commit an armed robbery. To be sure, our holding in this regard does not change a district court's obligation to make particularized findings as to scope and foreseeability—consistent with our precedents in *Studley*, *Mulder*, and *Johnson*—before attributing a co-participant's acts or omissions to the defendant. Remand is unnecessary in this case, however, given the district court's findings that Pica had "a substantial role" in planning and orchestrating a robbery attempt in which a co-participant "would have a weapon," knowing that use of the gun "was a serious and distinct possibility." App'x at 44; *id.* at 69. These factual findings are more than sufficient to establish that the scope of Pica's agreement to commit an armed robbery encompassed the victim's murder. In such circumstances, where we are satisfied that the district court spoke "generally to the pertinent considerations" underlying its relevant conduct determination, *United States v. Manas*, 272 F.3d 159, 167 (2d Cir. 2001), and the facts are undisputed, we do not require the district court to "utter 'robotic incantations'" to determine that the scope requirement was adequately addressed, *United States v. Corsey*, 723 F.3d 366, 374 (2d Cir. 2013) (citation omitted).

In sum, we discern no error, much less plain error, in the district court's conclusion during two separate sentencing proceedings that the murder of

Antonelli was relevant conduct pursuant to U.S.S.G. § 1B1.3(a)(1)(B), triggering application of the first-degree murder Guideline. Accordingly, we affirm the district court's amended judgment.

## CONCLUSION

The murder of Antonelli, which occurred during the armed robbery attempt that Pica helped plan and execute, was reasonably foreseeable to Pica and was within the scope of his jointly undertaken criminal activity. The district court therefore did not err, much less plainly so, in determining that the Antonelli murder was relevant conduct under U.S.S.G. § 1B1.3(a)(1)(B) and in applying Guideline 2A1.1, pursuant to § 2B3.1(c)'s cross-reference thereto, on that basis. Accordingly, we **AFFIRM** the district court's amended judgment.